UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AJAY BAHL,                                              :

                      Plaintiff,                    :

          - vs -                             :      **MEMORANDUM DECISION**

NEW YORK INSTITUTE OF                      :      14-CV-4020 (DC)
TECHNOLOGY,

                                :

                      Defendant.                    :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**      LAW OFFICES OF RUDY A. DERMESROPIAN, LLC
                      By:    Rudy A. Dermesropian, Esq.
             810 Seventh Avenue, Suite 405
             New York, NY  10019
                  Attorneys for Plaintiff

             CLIFTON BUDD & DeMARIA, LLP
                      By:    Douglas P. Catalano, Esq.
                          Stephanie R. Toren, Esq.
             350 Fifth Avenue, Suite 6110
             New York, NY  10018
                  Attorneys for Defendant

CHIN, Circuit Judge:

       In this case, plaintiff Ajay Bahl sued defendant New York Institute of

Technology ("NYIT") alleging, *inter alia*, discrimination based on disability in

violation of federal, state, and city law.  This Court (Morrison, *J.*) denied NYIT's motion for summary judgment as to Bahl's failure to accommodate claims under the Rehabilitation Act of 1973 (the "Rehabilitation Act") and the New York State Human Rights Law (the "NYSHRL"), *Bahl v. N.Y. Coll. of Osteopathic Med.*, 683 F. Supp. 3d 224 (E.D.N.Y. 2023), but granted summary judgment in favor of NYIT dismissing Bahl's remaining claims, holding that Bahl was bound by his prior lawyer's withdrawal of the claims, *Bahl v. N.Y. Coll. of Osteopathic Med.*, No. 14-cv-4020-NRM, 2024 WL 866137 (E.D.N.Y. Feb. 28, 2024).  The case was thereafter reassigned to the undersigned for trial.

Trial commenced on June 10, 2024.  The jury returned a verdict on June 14, 2024, finding that Bahl was a qualified individual with a disability under both the Rehabilitation Act and the NYHRL, but finding further that Bahl had not proven that NYIT had failed to provide him a reasonable accommodation in violation of either law.  Tr. at 860-61.

Represented by new counsel, Bahl now moves for judgment as a matter of law pursuant to Rule 50 or, alternatively, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.  *See* Plaintiff's Mem. in Support

of Post-Trial Motions ("Pl. Mem."), Doc. 295-1 at 2-3.  For the reasons that follow, the motion is denied in all respects.

## BACKGROUND

### A.    The Facts[1]

#### 1.    The Plaintiff

Bahl graduated from New York University ("NYU") in 2007, receiving a degree in psychology.  He completed his undergraduate studies in four years.  Tr. at 262-63.  During his time at NYU, he was diagnosed with attention deficit hyperactivity disorder ("ADHD") and was prescribed medication.  *Id*. at 265.  Thereafter, he spent six months at a special sciences program at the University of Pennsylvania ("Penn").  *Id*. at 265-66.  While at NYU and Penn, he became interested in attending medical school and did some studying to prepare.  *Id*. at 266.  Because of his struggles maintaining focus, he reached out to a psychiatrist for further evaluation and treatment.  *Id*.

Bahl received treatment from several doctors over the years.  Dr. Lenard Adler, a psychiatrist, has treated Bahl for ADHD, anxiety, and depression

---

[1]    As the jury returned a verdict in favor of NYIT and Bahl moves for judgment as a matter of law pursuant to Rule 50, I construe the evidence and draw all reasonable inferences in favor of NYIT as the non-movant. *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 247 (2d Cir. 2005).

for more than 15 years, seeing him approximately monthly and providing

medication management.  Adler observed that Bahl has had trouble paying

attention, organizing, planning, and executing tasks, and has been anxious,

restless, and easily distracted.  He also suffered from "speech cluttering."  *Id*. at

46-48; *see also id*. at 94-96 (deposition of Dr. Yellin).  Bahl also received cognitive

behavioral treatment from Dr. Fazzari for at least ten years, "[e]very week for 45

minutes," *id*. at 441, and he also saw Dr. Shapiro "a handful of times," although

"not in any long-term way," *id*. at 337-38; *see also id*. at 364-66, 370, 416-17.

### 2. <u>Medical School and Graduation Requirements</u>

Bahl applied to medical school and was admitted to NYIT.[2]  He

started there in the summer of 2008.  *Id*. at 267.  In the ordinary course, he would

have finished medical school and graduated in December 2012.  *Id*. at 640.

Students were expected to complete medical school in four years, with an outer

limit of six years, as students were supposed to complete all degree requirements

within six years.  *Id*. at 583, 712.

---

[2]      At times at trial and in the underlying documents NYIT is referred to as
"NYCOM."  *See, e.g.*, Tr. at 22, 54.  They are the one and the same, and I refer to it in this
decision as NYIT.

In accordance with the requirements of the accreditation body (the Commission on Osteopathic Accreditation), students were required to complete the medical school curriculum and pass the licensure exams, known as COMLEX Levels 1 and 2, to graduate. In years one and two, students had to complete the course work, consisting of lectures and laboratories. The COMLEX 1 exam was usually taken after year two. Years three and four consisted of clinical experiences -- clerkships -- at a hospital or clinic or doctor's office. The COMLEX 2 exam consisted of two parts -- the CE was a written exam, and the PE was a physical exam with actors playing patients. *Id*. at 573-75, 648. A student who did not pass the COMLEX 1 exam could not proceed to his third year. In the ordinary course, a student who did not pass the COMLEX 1 and both parts of the COMLEX 2 was at risk of being dismissed from the school. *Id*. at 572-76, 624-25, 640.[3] The COMLEX exams were administered by an independent, third-party testing organization, the National Board of Osteopathic Medical Examiners (the "NBOME"). *Id*. at 17, 223, 297-98, 701.

---

[3] The PE portion of the COMLEX 2 exam has been suspended since the COVID pandemic. Tr. at 575-76.

### 3.    Bahl's Partial Completion of the Requirements

Bahl completed his first two years at NYIT successfully. *Id*. at 267-68. He then took the COMLEX 1 exam but did not pass. Students who did not pass the COMLEX 1 were given a COMLEX 1 leave to study to re-take the exam. Bahl took a COMLEX 1 leave and then passed the exam. *Id*. at 268-70; *see* PX 5.

Bahl then moved on to his third year, to do a rotation of some five or six clerkships. He started his first third-year clerkship in the late summer or early fall of 2010. *Id*. at 271-72. In June 2011, while still in his third year, Bahl started a clerkship at Plainview Hospital. *Id*. at 274-75. The hospital complained of issues with Bahl from the outset, when he appeared late for orientation on his first day (while also "inappropriately attired") and then was late again on the second day for the start of his rotation. Thereafter, he was "frequently late" and also had several unexcused absences. DX K. Later in the clerkship, Bahl showed up late for a thoracic surgical procedure. He was dressed inappropriately again and had not scrubbed up -- he was there to observe the surgery, which involved cutting open a patient's chest. The hospital again complained to NYIT. DX L.[4]

---

[4]    Plainview reported to NYIT on June 28, 2011, that the day before:

[Bahl] entered the OR inappropriately dressed with a long sleeved zippered turtle neck shirt under his scrubs. The nurse told him that he

NYIT commenced disciplinary proceedings, but Bahl elected to take a medical

withdrawal from the medical school, which meant he would have the ability to

seek reinstatement. As a consequence, NYIT did not proceed with an

investigation and no disciplinary charges were brought. Tr. at 628-38; DX N

(withdrawal form, noting reason for withdrawal as "Medical" and withdrawal

date as "7/11/11"). Eventually, Bahl was able to return to school after receiving

clearance from a medical consultant to do so. *Id*. at 638-39; DX Q (letter from Dr.

Belkin dated August 8, 2011, clearing Bahl to return "starting September 1, 2011 if

he will continue his psychiatric treatment"). He went on to complete the surgical

clerkship at a different facility. *Id*. at 283-84.

Bahl successfully completed his third year and moved on to his

fourth year, which he started in the fall of 2011. He successfully completed all

his fourth-year clerkships. To graduate by his scheduled graduation date of the

---

was not dressed correctly, he promptly ignored her and continued to walk
to the other side of the room. . . . He was told by the RN and scrub tech
that he was too close to the sterile field. He argued that he had a lot of
room. In addition, [the surgeon] asked why he did not scrub in as it was a
major thoracic case and he stated that he was tired as he did not get any
sleep the night before. His behavior was very disruptive and tiring as the
staff was on constant alert to his potential to contaminate the field.

DX L.

end of December 2012, all he had left was to pass the two parts of the COMLEX 2 exam. *Id*. at 284-85, 292. He was unable to do so.

### 4. <u>The COMLEX 2</u>

Bahl took and failed the PE component of the COMLEX 2 exam three times and the CE component two times for a total of five failures on the COMLEX 2. *Id*. at 387; *see* DX S (showing, as of the date of the report, one CE failure and two PE failures, with a CE exam scheduled for July 1, 2013). He cancelled the CE test twice and the PE exam eighteen times, for a total of twenty cancellations. Tr. at 641; DX S. Felicia Bruno, the assistant dean who has been at NYIT for twenty-one years, testified at trial that "[i]n all the years [I've been] there I have never seen anyone to this date, in fact, cancel the exam 20 times." *Id*. at 641; *see also id*. at 675 ("it is highly, highly unusual . . . that anyone would cancel an exam 20 times").

On July 31, 2012, Bruno wrote Bahl an email expressing concern because he had cancelled his PE exam eight times (as of that date). *Id*. at 641-42; DX Z. She observed that Bahl had rescheduled the test for January 24, 2013, after his graduation date, and advised him to change the date of the exam so that he could pass the exam before December 31, 2012. Tr. at 642-43; DX Z. In the

ordinary course, NYIT could dismiss him if he did not pass by December 31, 2012. *Id*. at 643.

By December 3, 2012, however, Bahl still had not passed either part of the COMLEX 2 test and it was apparent he would not do so by his scheduled graduation date. Accordingly, Bruno wrote Bahl a letter requesting that Bahl contact her to discuss the application process for a COMLEX Level 2 Leave of Absence. *Id*. at 644; DX AA. They had a discussion, and Bruno advised Bahl to take the COMLEX 2 leave. Tr. at 644. As she explained, "we were doing everything in our power to help him, to provide additional time for him to prepare for these exams that needed to be passed." *Id*. at 644. On December 6, 2012, Bahl signed the form for a COMLEX 2 leave. *Id*. at 644-45; DX BB. Bahl failed both the CE and the PE in December 2012; his score on the CE was an "extremely low 280 (400 is a passing score)." DX HHH at 1. Accordingly, NYIT could have dismissed him on December 31, 2012, for not meeting the requirements, but it did not do so. Tr. at 645-46.

Bahl was granted a six-month COMLEX 2 leave, from January 1 through June 30, 2013. *Id*. at 646; DX EE. The letter from NYIT confirming that he had been approved for the leave advised him that "if the NBOME has not

notified [NYIT] that you have passed the COMLEX Level II CE by June 29, 2013, you will be considered dismissed from [NYIT] without the right to petition for reinstatement/readmission."  DX EE at 2.

On or about May 1, 2013, Bahl requested an accommodation from the NBOME to take the CE.  Tr. at 646-47; DX KK.  He asked the NBOME for "double time" to take the exam.  DX KK at 2.  On June 19, 2013 -- just eleven days before the deadline for Bahl to take and pass the COMLEX 2 exams -- Bahl applied to the NBOME for an accommodation to take the PE test.  DX OO; Tr. at 653.  Bruno was asked to provide information on the forms that Bahl was submitting to the NBOME.  DX KK at 4; DX OO at 4; Tr. at 649-51, 654-56.[5]

Although Bahl was supposed to pass both parts of the COMLEX 2 by June 30, 2013, or risk being dismissed from the school, Tr. at 649-50, 656, by early June it became apparent that he would not be able to do so.  Bahl asked to be enrolled in a ten-week remedial course, called the Directed Study Course, after the completion of his COMLEX 2 leave.  Although NYIT was not required to let Bahl take the Directed Study Course, the student progress committee and the Dean of NYIT approved the request on June 13 and June 14, 2013,

---

[5]    Bruno certified that NYIT's records showed that Bahl had not requested or been granted an accommodation from the school.  DX KK at 4; DX OO at 4; Tr. at 650.

respectively. DX MM, NN; Tr. at 657-61. The Directed Study Course was scheduled to be completed by September 9, 2013 and under the rules Bahl was required to have passed both parts of the COMLEX 2 by then or he could be dismissed. Tr. at 661-62; *see also id.* at 303 (Bahl testifying that he understood he would be dismissed by the school if he did not pass COMLEX 2 by September 9, 2013).

On July 12, 2013, the NBOME sent Bahl a letter advising him that his request for an accommodation for the COMLEX 2 CE test was "not approved." DX PP at 2; *see* Tr. at 299.[6] On July 15, 2013, Bahl advised Bruno by email that the NBOME had not approved his request for an accommodation for the CE. DX QQ.

On July 24, 2013, Bruno asked the Director of the Institute for Clinical Confidence at NYIT to enroll Bahl in the "Capstone" course, a simulation course where students prepare for the PE exam by working with "patients" hired by the school. DX RR. Bruno emailed the Director: "We have to get Ajay Bahl into your center for capstones immediately. He is basically at the end of [his]

---

[6] NBOME's letter explained that Bahl's "documentation fails to indicate disabling impairment in any major life activities and in the specific types of academic or test taking activities required for accessing the COMLEX-USA Level 2-CE examination." DX PP at 2.

time here and has one chance left to take the PE exam which is happening in roughly four weeks.  Can you do whatever you have to in order to set up dates for him."  *Id*. at 1-2.  The Director responded that "Ajay has been through capstone multiple times already, and we've tutored him at the St Barnabas program for hours.  But if there is an opening at the next capstone, we will put him in again."  *Id*. at 1.  Bruno wrote back:  "Please do.  This is urgent."  *Id*.; *see* Tr. at 662-64.  It was "urgent," in Bruno's mind, because she wanted him to pass.  *Id*. at 664.  In fact, Bahl was permitted to take the additional Capstone.  *Id*. at 662.

In August 2013, Bahl communicated with the NBOME regarding his request for accommodations.  As the NBOME representative explained in an email dated August 23, 2013, because of an error, it had not reviewed Bahl's application for an accommodation on the PE.  DX UU; Tr. at 300.  Bahl had indicated to the representative that he wanted to submit additional documentation to support the request, but the representative explained that the submission of additional documentation would likely mean a delay on a decision until the first week of October.  The representative asked Bahl how he wanted to proceed.  DX UU.  It is not clear whether Bahl ever submitted any additional documentation, but by letter dated September 3, 2013, the NBOME advised Bahl

that his request for an accommodation for the PE was "not approved."  DX YY;

*see* Tr. at 299.

As noted, Bahl was required to pass both parts of the COMLEX 2 by September 9, 2013.  Bahl took the PE on September 5th and took the CE on September 9th, the last day of the Directed Study Course.  He did not pass either test.  His score on the CE was 262.[7]  NYIT could have dismissed him at that point but did not.  *Id*. at 661-62, 666; DX FFF at 2; DX HHH at 2.[8]

---

[7]    Again, the score of 262 was well below the passing score of 400 -- and Bahl's score actually dropped from the score of 280 he received in December 2012, nine months earlier.  DX HHH at 1.

[8]    Bahl's treatment notes showed that his difficulties in medical school were attributable at least in part to his use of marijuana, excessive socializing, and lack of medication compliance.  In a consultation on October 13, 2010, Bahl reported that for the first year and a half of medical school, he smoked marijuana socially approximately three times a week.  DX D; Tr. at 407.  Bahl was still smoking marijuana excessively in 2014, as Dr. Fazzari reported on May 1, 2014, that "[Bahl] has had difficulty refraining from smoking MJ."  DX XXXX.  Bahl acknowledged at his deposition that it was not advisable for someone who was being treated for ADHD and other ailments to be smoking marijuana on a weekly basis.  Tr. at 402-03.  At times Bahl also drank alcohol to excess.  *Id*. at 411-13 (acknowledging that he reported to his therapist that in a typical week he had more than four drinks on one day and that "probably" got him drunk), 413-15 (acknowledging that he reported to his therapist having ten drinks in one day while in medical school); DX YYY at 3.  On May 31, 2012, Dr. Fazzari noted that "[Bahl] has had trouble studying consistently because of taking his medication inconsistently and socializing late at night, which disrupted his sleep pattern."  DX BBBB; *see* Tr. at 416-17.  On June 11, 2013, Dr Fazzari wrote: "[Bahl] stayed up later than anticipated last night, throwing off his sleep schedule.  He had gotten distracted by surfing the Internet in part because he did not take his evening medications."  DX MMMM.  On October 28, 2013, Bahl told Dr. Fazzari that he had "not been forthcoming about his lack of

### 5.    Bahl's Request to NYIT for an Accommodation

In the meantime, on August 19, 2013, Dr. Adler wrote a letter to NYIT in support of Bahl's request for a six-month "medical leave" to allow Bahl "sufficient time to ameliorate life impairment from several disorders note below [in the letter]."  PX 20.  The letter described Bahl's disorders and concluded that:

> *It is my medical opinion that AJ merits receiving a six month medical leave for treatment of his ADHD, Deficits in Executive Function, Generalized Anxiety Disorder and Speech Cluttering.*  This medical leave would permit him adequate time to make gains in cognitive behavioral and speech therapy, and in his work with the learning specialist, to ameliorate the impact of the substantial impairments noted above.

PX 20 at 3 (emphasis in original).[9]  On August 28, 2013, Bahl's then-attorney, Stuart Lee Karlin, wrote a letter to NYIT supplementing Bahl's request for a six-month leave of absence.  PX 22.  Karlin's letter apparently transmitted Dr. Adler's letter.  Tr. at 305-06 (describing Karlin's letter as "like a cover letter to this medical leave letter").

There was an exchange of emails in September 2013.  On September 20, 2013, Bahl wrote an email to NYIT to make sure that his request for an

---

medication compliance."  DX B; *see* Tr. at 389-93.  Dr. Fazzari concluded that "[t]his contributes to increased sleep problems and mood lability."  DX B.

[9]      Bahl had previously provided to NYIT letters dated July 15 and 29 written by Dr. Adler describing Bahl's medical status and treatment.  Tr. at 279-81; PX 7, 8.

accommodation from the school had been received. PX 25. Patricia Molesphini of NYIT wrote back advising that "any accommodation in taking the COMLEX exam must be made by NBOME," and asking whether Bahl had made the request to NBOME. *Id*. Later that afternoon, Mary Ann Achtziger emailed Bahl and advised him that "you do not qualify for a medical leave of absence." *Id*. She explained that, as set forth in the student handbook, only active students could apply for a medical leave, and Bahl was "presently on a COMLEX Leave of Absence." *Id*.

Bahl considered Dean Achtziger's email to be a denial and, although he had been represented by Karlin, he hired another attorney, William Goren. *Id*. at 309. A few days later, Goren sent to the Assistant Director at the Office of Disability at NYIT a document dated September 24, 2013, that he labeled "ADA Grievance of Ajay Bahl." PX 26; *see* Tr. at 146-48, 310.

On October 11, 2013, Goren spoke to Jordan Thompson, the assistant general counsel at NYIT; they had "an exchange of views." Tr. at 149-50. Thompson followed with a letter dated October 21, 2013, to Goren in which he responded to Goren's September 24, 2013, letter. DX HHH; Tr. at 700-01. In his letter, Thompson advised Goren that while NYIT did "not in fact believe that any

accommodation is warranted," NYIT was willing to make an "exception to [its]

policies and procedures as a good faith effort at resolving this matter."  DX HHH

at 3.  Thompson proposed, on behalf of NYIT, that (1) Bahl would be placed on a

withdrawal for financial aid purposes only, effective immediately; (2) NYIT

would approve Bahl's application for a retest of the COMLEX 2 exams provided

NBOME gave him a testing accommodation and the test date would allow the

results to be available by January 31, 2014; (3) NYIT would not approve Bahl's

application for a retest if the NBOME did not provide him an accommodation;

and (4) if Bahl did not take and pass the COMLEX 2 by January 31, 2014, NYIT

would dismiss him on that date.  *Id*. at 2-3.  Thompson noted that Bahl had

passed all of his previous exams without any accommodation, he had been in

treatment for his learning disability for more than two years already, his

"extremely low scores" on the COMLEX 2 did not seem to benefit from his

treatment, and "there is no reason to believe that an additional six months

treatment would raise his score dramatically."  *Id*. at 3.

On October 12, 2013, Bahl had indeed, at his choice, been

"withdrawn from the school for financial aid purposes."  Tr. at 667; *see* DX GGG.

The school could have dismissed him at that point because he still had not

passed the COMLEX 2 but chose not to. Tr. at 667. If Bahl had been dismissed,

there would have been no opportunity for him to come back to the school. With

a withdrawal, however, he had "the ability to be reinstated." *Id*. at 668. By letting

Bahl go on withdrawal status, NYIT was giving him time to get the

accommodation he had been seeking from the NBOME. Tr. at 702. Thompson

explained:

> [A]t no point had we really thought about dismissing Mr. Bahl at this point in time, although we were probably entitled to on numerous occasions prior to October . . . of 2013. But the school, the institution is a not for profit institution. There was no sort of motivation to have him fail here in his endeavor to graduate medical school.
>
> So we gave him some time, thinking that we would hear back fairly quickly on his attempts to get the accommodation he needed from the NBOME. And that's kind of where we left off after this letter was written.

*Id.*

But NYIT did not hear back from Bahl or his attorneys -- it was

"radio silence" -- until January 2014. *Id*. at 702-03. On January 29, 2014, instead of

reporting on Bahl's efforts to obtain an accommodation from the NBOME, Goren

sent Thompson a letter advising that he had filed a petition with the Office of

Civil Rights ("OCR") of the U.S. Department of Education and the Department of

Justice asserting a violation of the Americans with Disabilities Act. DX JJJ; Tr. at 156-57. Goren wrote that "it is our hope that the school will reconsider dismissing him at the end of this week so as to allow the process with OCR and the Department of Justice to take its course." DX JJJ.

Thompson responded by letter dated January 31, 2014; he left open the possibility that NYIT would reconsider and he also sought an update on Bahl's efforts to obtain an accommodation from the NBOME:

> Before [NYIT] may reconsider any decision to dismiss your client in accordance with its policy, as already extended, please inform us what attempts Mr. Bahl has taken to obtain a testing accommodation from NBOME and the status of those attempts. Otherwise there is no purpose to even consider further deferring Mr. Bahl's dismissal.

DX KKK at 2. NYIT did not dismiss Bahl on January 31, 2014. Tr. at 704.

Goren did not respond to Thompson's letter, and, instead, Thompson heard from yet another new attorney for Bahl, Kevin Mulhearn. *Id*. Thompson learned that Mulhearn would be accompanying Bahl to an "education record inspection." DX LLL. Thompson reached out to Mulhearn by email on February 20, 2014, saying: "I thought this would be a good opportunity to reach out to you and see if you had any additional information regarding [Bahl's] taking of the COMLEX II exams?" *Id*. Thompson further advised that NYIT had

"not taken any action as to your client's status since [Thompson's] letter of October 21, 2013." *Id*.

Mulhearn responded by email the same day: "Thank you for your courtesies. I will review this issue with Mr. Bahl and get back to you as soon as practicable." *Id*. Mulhearn did not, however, follow up in writing. Tr. at 707. While Thompson met Mulhearn at the document inspection, there was no further substantive response, and through the summer of 2014, NYIT never received any notice that Bahl had sought or received an accommodation from NBOME. *Id*. at 708-10.

Bahl never passed either part of the COMLEX 2, but NYIT has never dismissed him; his status is still "withdrawn student." *Id*. at 668-69.

**B.**    **Procedural History**

Bahl commenced this action on June 27, 2014, against NYIT, the NBOME, and Plainview Hospital. *See* Doc. 1. NYIT answered on September 26, 2014. *See* Doc. 27. Bahl filed an amended complaint on August 17, 2015, *see* Doc. 77, and NYIT answered on August 31, 2015, *see* Doc. 80.

Bahl's claims against Plainview Hospital were voluntarily discontinued in October 2015. *See* Docs. 88, 90. NBOME moved to dismiss or

transfer, and on March 31, 2017, the motion was granted to the extent the claims

against NBOME were transferred to the federal court in Indiana. *Bahl v. N.Y.*

*Coll. of Osteopathic Med.*, No. 14-cv-4020-AKT, 2017 WL 5479655 (E.D.N.Y. Mar.

31, 2017). Bahl's interlocutory appeal to the Second Circuit from that decision

was dismissed for lack of appellate jurisdiction as the decision was not a final

order. *See* Doc. 153.

NYIT moved for summary judgment on February 21, 2023. *See* Doc.

235. Represented by counsel, Bahl opposed the motion with respect to his failure

to accommodate claims, but in its opposition papers, counsel withdrew all of

Bahl's remaining claims.[10] By letter dated June 29, 2023, proceeding *pro se*, Bahl

wrote to the court advising that he had terminated his attorneys and asserting

that he had not authorized the withdrawal of his claims. *See* Doc. 241. The Court

(Morrison, *J.*) denied NYIT's motion as to the reasonable accommodation claims,

concluding that, with every reasonable inference drawn in Bahl's favor, "a jury

could find that NYIT's proposed accommodation was *not* 'plainly reasonable' as a

---

[10]    In their memorandum in opposition to NYIT's motion for summary judgment,
Bahl's counsel wrote: "Plaintiff now withdraws his claims for disparate treatment
discrimination, retaliation, hostile learning environment, aiding and abetting
discrimination, equal protection, breach of an implied agreement, negligent infliction of
emotional distress, negligent misrepresentation, deceptive practices, and his New York
City Human Rights Law claims." Doc. 236 at 5.

matter of law when considering the two key terms of NYIT's proposed accommodation: (1) the length of time and (2) the condition that Bahl secure an accommodation from NBOME and receive his COMLEX 2 results by January 31, 2024." *Bahl*, 683 F. Supp. 3d at 233 (emphasis in original). The Court reserved decision as to Bahl's remaining claims pending briefing as to whether, through his counsel's actions, Bahl had waived his right to oppose summary judgment on those claims. *Id*. at 238. Following briefing, the Court (Morrison, *J*.) granted summary judgment dismissing the remaining claims, concluding that "Bahl is bound by his former counsel's withdrawal of the claims." *Bahl*, 2024 WL 866137, at *1.

The case was reassigned to the undersigned on March 4, 2024, when Bahl was *pro se*. *See* Dkt. Entry for 3/4/2024. On March 17 and 18, new counsel appeared for Bahl -- Megan S. Goddard of Goddard Law PLLC and Nathaniel K. Charny of Charny & Wheeler P.C. *See* Docs. 257, 258. Motions *in limine* were filed and I ruled on the motions on the record on May 28, 2024. *See* Dkt. Entry for 5/28/2024. At the same time, I denied Bahl's request to reconsider Judge Morrison's earlier dismissal of his New York City law claims. *Id*.

Trial commenced on June 10, 2024.  On June 14, 2024, the jury returned a verdict in favor of NYIT, finding no liability.  *See* Dkt. Entries for 6/10, 2024, 6/14/2024.  The jury found that Bahl was "a qualified individual with a disability" under both the Rehabilitation Act and the NYSHRL, but it also found that Bahl had not proven by a preponderance of the evidence that "NYIT failed to provide a reasonable accommodation for Mr. Bahl's disability," in violation of either the Rehabilitation Act or the NYSHRL.  Tr. at 860-61.

Judgment was entered on June 17, 2024, decreeing that "plaintiff recover nothing and the action is dismissed on the merits."  Doc. 281.

The next day, both of Bahl's then-lawyers moved for leave to withdraw.  *See* Doc. 282 (sealed).  I granted the motion based on the circumstances set forth in counsel's sealed declaration and based on my observations of Bahl's interactions with his lawyers both before and during trial.  *See* Doc. 284.

Bahl retained new counsel, Rudy A. Dermesropian of the Law Offices of Rudy A. Dermesropian, LLC, who filed a notice of appearance on July 10, 2024.  *See* Doc. 286.  As the docket sheet shows, Mr. Dermesropian is the thirteenth lawyer to appear for Mr. Bahl in this lawsuit, Dkt. Sheet at 1, and, as

noted above, Bahl was represented by two other lawyers (as well as one of the thirteen) in the proceedings before suit was filed. *See* PX 22 (Stuart Lee Karlin); PX 26 (William Goren); DX LLL (Kevin Mulhearn).

On July 17, 2024, Bahl's new counsel filed a notice of appeal on his behalf. *See* Doc. 290.

After two extensions of time, Bahl's new counsel filed the instant motion for judgment as a matter of law or for a new trial on July 29, 2024. *See* Doc. 288, 294, 295.

On August 13, 2024, the Second Circuit stayed Bahl's appeal pending resolution of this motion. *See* Doc. 299.

## DISCUSSION

Bahl seeks judgment as a matter of law or a new trial for a host of reasons: (1) the Court erred in permitting the jury to decide whether NYIT offered him a reasonable accommodation, Pl. Mem. at 3-8; (2) the Court should not have permitted William Goren, his former counsel, to testify at trial, *id*. at 9; (3) the Court failed to instruct the jury that NYIT had a legal obligation to offer him a reasonable accommodation even if he did not request one, *id*. at 10-12; (4) the Court instructed the jury that NYIT offered him a different accommodation

when he contested this fact, *id*. at 11-13; (5) the Court denied the jury the opportunity to review evidence, *id*. at 13-14; (6) the Court did not permit him to call two witnesses, John Purcell and Todd Regnier, *id*. at 15-17; (7) the Court engaged in partial and/or biased conduct, *id*. at 17-20; (8) the Court failed to include interrogatories in the verdict sheet and certain instructions in the charge related to the concept of reasonable accommodation, *id*. at 20-21; (9) the Court allowed the jury to hear evidence that he had failed to respond to NYIT's proposal, *id*. at 22-23; (10) the Court allowed evidence of his purported use of marijuana, *id*. at 23-24; and (11) defense counsel's summation was improper and prejudicial, *id*. at 24-27.

## I.    Applicable Legal Standards

Bahl moves for judgment as a matter of law pursuant to Rule 50 or, alternatively, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. *See* Pl. Mem. at 2-3.

### A.    Rule 50

After a jury has returned a verdict, a movant's burden on a Rule 50 motion is "particularly heavy." *Cross*, 417 F.3d at 248. "Under such circumstances, the district court may set aside the verdict only where there is

'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" *Id.* (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). "Judgment as a matter of law may be entered against a party only if 'a reasonable jury would not have a legally sufficient basis to find for [a] party on that issue.'" *Tepperwein v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)).

While the court "may consider all the record evidence," it must also "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross*, 417 F.3d at 247. The Second Circuit has observed that this standard "is a high one, met only in 'rare occasions.'" *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018) (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir. 1992)).

**B.**    **<u>Rule 59</u>**

Under Rule 59, a district court may "grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in

federal court."  Fed. R. Civ. P. 59(a)(1)(A).  When considering a motion for a new trial, the court may "examine the evidence through its own eyes," *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001), and "need not view the evidence in the light most favorable to the verdict winner."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

A new trial "ordinarily should not be granted," however, unless "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."  *Snyder v. N.Y. State Educ. Dep't*, 486 F. App'x 176, 177 (2d Cir. 2012) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)).  Indeed, the Second Circuit has emphasized that a judge "should rarely disturb a jury's evaluation of a witness's credibility," and that it is proper for a court to deny a motion for a new trial if the resolution of issues "depend[s] on assessment of the credibility of the witnesses."  *Raedle*, 670 F.3d at 418 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)).

## II.  <u>Application</u>

With the exception of his last point -- that defense counsel made improper and prejudicial remarks during summation -- Bahl's memorandum in support of his motion does not distinguish between the two prongs of his

motion.  *See* Pl. Mem. at i-ii.  For his last point, Bahl seems to request only a new trial.  *See id.* at 24-27.  I will likewise discuss the requests for judgment as a matter of law and for a new trial together, except with respect to Bahl's last point about defense counsel's summation.

Bahl's twelve points of error fall into the following categories: (1) issues related to the concept of reasonable accommodation (claims 1, 3, 4, and 8 above); (2) evidentiary issues (claims 2, 5, 6, 9, and 10 above); (3) the Court engaged in partial and/or biased conduct (claim 7 above); and (4) defense counsel's summation was improper and prejudicial (claim 11 above).  I address each category in turn.

A.    <u>Reasonable Accommodation</u>

Bahl raises several issues with respect to the concept of reasonable accommodation:  (1) the court erred in permitting the jury to decide whether NYIT offered him a reasonable accommodation, Pl. Mem. at 3-8; (2) the Court failed to instruct the jury that NYIT had a legal obligation to offer him a reasonable accommodation even if he did not request one, *id*. at 10-11; (3) the Court instructed the jury that NYIT offered him a different accommodation when he contested this fact, *id*. at 11-13; and (4) the Court failed to include

interrogatories in the verdict sheet and certain instructions in the charge relating to the concept of reasonable accommodation, *id*. at 20-21.

### 1.   A Question for the Jury

Bahl's principal argument is that the Court erred in submitting the question of reasonable accommodation to the jury.  He argues that because NYIT offered a reasonable accommodation with conditions that were impossible to meet, *i.e.*, passing the COMLEX 2 by January 31, 2014 and obtaining accommodations from the NBOME, NYIT's proposal was unreasonable as a matter of law.  *Id*. at 5-6.  The argument fails, for the jury had several legally sufficient justifications for finding in favor of NYIT on this issue.

First, the jury was asked to decide whether Bahl had proven, by a preponderance of the evidence, that "NYIT failed to provide a reasonable accommodation for Mr. Bahl's disability," in violation of either the Rehabilitation Act or the NYSHRL.  Tr. at 860-61.  In deciding whether NYIT had failed to provide Bahl with a reasonable accommodation, the jury could have reasonably considered not just the offer that NYIT made in Thompson's letter of October 21, 2013, DX HHH, but the entire series of accommodations it gave to Bahl: (1) in July 2011, following Bahl's difficulties at Plainview Hospital, NYIT permitted him

to take a medical withdrawal instead of subjecting him to disciplinary proceedings; (2) in December 2012, NYIT permitted him to take a COMLEX 2 leave of absence from January 1 through June 30, 2013; (3) in June 2013, following the completion of the COMLEX 2 leave, NYIT permitted him to take a ten-week Directed Study Course; (4) in July 2013, NYIT permitted him to take a third Capstone; and (5) in October 2013, NYIT permitted Bahl to take a financial withdrawal, which gave him the ability to apply for reinstatement. At any of these steps, NYIT could have dismissed him but it did not do so. In context, the jury could have found that the additional offer of yet another three months, even with the condition of accommodations from NBOME, was reasonable.

Second, the jury could have found that NYIT acted reasonably in insisting that Bahl obtain accommodations from the NBOME. After all, he had been given ample time to address his health issues and to prepare for the exams, that is, from the start of his COMLEX 2 leave on January 1, 2013, if not before. He first canceled the PE on August 1, 2011 and the CE on August 24, 2011, *see* DX S, and it was apparent from the ongoing failures and cancellations that there was a serious issue. Indeed, NYIT saw that Bahl's CE score actually dropped from 280 in December 2012 to 262 in September 2013, with both scores far below the

passing grade of 400.  NYIT could see that the additional time for continued

medical treatment did not help.  The jury could have determined that, by

October 2013, NYIT's belief that Bahl would not be able to pass without testing

accommodations from NBOME was eminently reasonable.  The jury could have

further determined that, because continued medical treatment was not the

answer, Bahl could have obtained accommodations from NBOME and taken the

COMLEX 2 within three months.

Third, the jury could have reasonably found that Bahl was

responsible for a breakdown in the interactive process of negotiating a

reasonable accommodation.  *See* Tr. at 830.[11]  In October 2013, NYIT permitted

Bahl to go on a financial withdrawal rather than dismiss him so that he would

retain the ability to seek reinstatement.  NYIT expected to hear from Bahl or his

attorneys as to his efforts to seek testing accommodations from NBOME, but

there was "radio silence."  Instead of responding to NYIT, Goren filed a charge,

---

[11]     *See Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) ("The ADA
envisions an 'interactive process' by which employers and employees work together to
assess whether an employee's disability can be reasonably accommodated."); *Monterroso
v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) ("An employee
seeking an accommodation is obliged to participate in this *interactive process* in order to
help the employer identify the 'precise limitations resulting from the *disability* and
potential reasonable accommodations that could overcome those limitations.'") (quoting
29 C.F.R. § 1630.2(o)(3)).

on Bahl's behalf, with OCR. Thompson responded with a letter on January 31,

2014, inviting further discussion. And in a February 20, 2014 email, Thompson

made yet another effort to obtain information, with Bahl's third attorney;

Thompson specifically advised that NYIT had "not taken any action as to [Bahl's]

status." Bahl and his attorneys did not respond; yet, NYIT did not dismiss Bahl

and his status remains "withdrawn student."

Finally, the jury was charged that:

> To be reasonable, an accommodation need not be perfect or the one
> preferred by the plaintiff, but it must be effective in the sense that it
> will provide the plaintiff with meaningful access to the program,
> service, or activity in question. A reasonable accommodation is one
> that levels the playing field by giving an individual with a disability
> the same opportunities afforded to others who do not have a
> disability and who are otherwise similarly situated. But a requested
> accommodation is not reasonable if it would present an undue
> burden on the operation of a covered entity's program, service, or
> activity, or if it would require a fundamental or substantial
> modification to the nature of its academic program or standards.

Tr. at 829-30. On this record, the jury could have reasonably concluded

that NYIT did more than level the playing field, and that Bahl's requested

accommodation of yet another six months after all the accommodations he

had already been granted would indeed have been an undue burden on its

operations or required a fundamental or substantial modification of its academic standards.

## 2. Plaintiff's Obligation to Request an Accommodation

Bahl also contends that I failed to instruct the jury that NYIT had a legal obligation to offer Bahl a reasonable accommodation even if he failed to request one. Pl. Mem. at 10. He cites to defense counsel's statement in opening that Bahl "never, ever asked anyone for a formal accommodation or some sort of testing accommodation through 2013." *Id*. (citing Tr. at 22). Defense counsel did indeed misspeak, as Bahl asked for accommodations both from the NBOME in May 2013 and from NYIT in August 2013. Defense counsel intended to say, however, as the record is clear, that Bahl had not previously requested or been granted an accommodation from NYIT or the NBOME, that is, before May 2013. The error is of no moment, for it is undisputed that Bahl did ask for these accommodations. Moreover, I specifically instructed the jury that "[i]n the education context, the Rehabilitation Act and the [NYSHRL] *require* a covered institution to offer reasonable accommodations for a student's known disability unless the accommodation would impose an undue hardship on the operation of its program. This is called 'a reasonable accommodation.'" Tr. at 828 (emphasis

added). I reiterated that if Bahl was indeed a person with a disability within the meaning of the laws, "then NYIT was *required* to provide him with a reasonable accommodation and you must determine whether NYIT failed to do so." *Id*. at 828-29 (emphasis added). I did not instruct the jury that this obligation arose *only* upon a request from Bahl.

### 3.   NYIT's Offer of a Different Accommodation

Next, Bahl argues that I erred in instructing the jury that "NYIT offered [plaintiff] a different accommodation," because he contested that fact. Pl. Mem. at 11-12 (quoting Tr. at 829). In context, what I charged was the following:

> It is undisputed that Mr. Bahl requested an accommodation
> and that NYIT offered him a different accommodation.

Tr. at 829. While Bahl now claims that he disputed whether NYIT offered a different accommodation, that was not the case at trial. Bahl's then-attorneys did not object to this part of the charge, *see* Tr. at 591-603, 729-37, 804-05,[12] and indeed the principal issue at trial was whether NYIT's offer of a different

---

[12]   *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) ("We have previously emphasized that '[f]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection . . . . Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions.'") (quoting *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992)); *see also* Fed. R. Civ. P. 51.

accommodation was reasonable. Moreover, Thompson's letter of October 21, 2013, indisputably offered a different accommodation.

### 4. Purported Omissions from the Charge and Verdict Sheet

Finally, Bahl now contends that I should have given certain additional instructions and included special interrogatories in the jury's verdict sheet with respect to the question of reasonable accommodation. Pl. Mem. at 20-22. In particular, he contends that:

> [T]he jury should have been instructed that (1) the conditions offered by defendant on October 21, 2013 were impossible to meet by the set deadline of January 31, 2014, and therefore the accommodation was not effective and not reasonable as a matter of law; (2) where a claim for failure to reasonably accommodate exists, the "NYSHRL is to be interpreted in light of the employee's request for a reasonable accommodation[,]" *Jacobsen*, 22 N.Y.3d 824; (3) if the employer "knew or had reason to know that [employee] had a disability, or perceived that made it difficult [*sic*] to perform his job . . . , or perceived that he had such a disability, then it had an obligation to offer a reasonable accommodation." *Brady*, 531 F.3d at 135.

Pl. Mem. at 21. First, Bahl did not request any of these specific instructions in his requests to charge, *see* Pl. Proposed Jury Instructions at 2-4 (Request No. 2), nor did he assert objections along these lines, *see* Tr. at 591-603, 729-37, 804-05.

Second, the first proposed instruction is a factual assertion and, as discussed above, the jury could have reasonably found that NYIT's proposal was

reasonable.  Third, the instructions I gave the jury, taken as a whole, fairly and

accurately stated the law.  *See* Tr. at 824-30.  "A trial court has discretion in the

style and wording of jury instructions so long as the instructions . . . do not

mislead the jury as to the proper legal standard."  *Parker v. Sony Pictures Ent., Inc.*,

260 F.3d 100, 106-07 (2d Cir. 2001) (internal citation omitted); *accord Coquina Invs.*

*v. TD Bank, N.A.*, 760 F.3d 1300, 1309 n.8 (11th Cir. 2014) ("[W]hen the

instructions, taken together, properly express the law applicable to the case, there

is no error even though an isolated clause may be inaccurate, ambiguous,

incomplete or otherwise subject to criticism." (internal quotation marks omitted)).

Finally, as to the verdict sheet, Bahl merely asserts in a point

heading that the verdict sheet failed to contain interrogatories without providing

any argument.  In any event, Bahl did not request special interrogatories at or

before trial, and he had no objections to the Court's proposed verdict sheet.  Tr. at

615, 736-37, 800, 804.  Hence, the argument is waived.

## B. <u>Evidentiary Issues</u>

Bahl raises five evidentiary issues:  (1) the Court should not have

permitted William Goren, his former counsel, to testify at trial, Pl. Mem at 9; (2)

the Court denied the jury the opportunity to review evidence, *id*. at 13-14; (3) the

Court did not permit him to call two witnesses, John Purcell and Todd Regnier, *id*. at 15-17; (4) the Court allowed the jury to hear evidence that he had failed to respond to NYIT's proposal, *id*. at 22-23; and (5) the Court allowed evidence of his purported use of marijuana, *id*. at 23-24.  None of the issues has merit.

1.  **Goren**

Bahl contends that he was significantly and unfairly prejudiced because his former counsel William Goren was permitted to testify about attorney-client communications, that is, Goren's conversations with his client Bahl.  *See* Pl. Mem at 9.  The short answer is that Goren was called as a witness by Bahl himself, *see* Tr. at 143, and Bahl's attorney asked Goren numerous questions eliciting the substance of his conversations with Bahl, *see, e.g., id*. at 145 (what Bahl believed), 147 (substance of Bahl's concern), 159-60 ("Mr. Bahl and I had different views as to how to prosecute the case. . . .  [H]e wanted someone to spearhead litigation and be very very aggressive.").  It would be unfair now to permit Bahl to rely on the attorney-client privilege when he put his lawyer on the stand himself.  *See In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("Underlying any determination that a privilege should be forfeited is the notion of unfairness.").  Moreover, Bahl did not object based on the attorney-client

privilege to any of defense counsel's questions on cross or re-cross examination or to the few questions I asked. *See* Tr. at 162-207. Any objection on this basis was waived.

## 2.   The Opportunity for the Jury to Review Evidence

Bahl contends that I wrongfully prevented the jury from reviewing evidence when I denied his attorney's request to see two exhibits in response to its note during deliberations. The note contained two parts:

> After the school's terms of accommodation email (2/20/2014 of Mr. Thompson) to plaintiff's attorneys is there any formal evidence on the record of a reply from the plaintiff or his attorneys; if so, can we see it?

> Can we see all these four exhibits, please, HHH, Plaintiff's Exhibit 26, KKK, and LLL.

CX 2; *see* Tr. at 850-51. There was no disagreement that these four exhibits would be submitted to the jury. *See* Tr. at 851. Bahl's attorney, however, wanted an additional exhibit -- not specifically requested by the jury -- to be submitted in response to this second part of the jury's note, as he stated: "We have a request for the Court to add an additional document to be produced, which is JJJ." *Id*. NYIT objected. *Id*. I denied the request, because the jury had not specifically asked for the exhibit. *See* Tr. at 851-

52.  In any event, DX JJJ was Goren's letter dated January 29, 2014, to Thompson advising that Bahl had filed a petition with the OCR, and it contains little of substance.

Bahl's counsel also asked to send in PX 56 as responsive to the first part of the note.  *See* Tr. at 852.  I also denied the request.  While the exhibit was in evidence, it was received as part of an offering of a group of exhibits without discussion and was never the subject of testimony during the trial.  *See* Tr. at 43, 853.  I therefore did not believe the jury had it in mind when it requested documents.  Moreover, the jury asked for any "reply from the plaintiff or his attorneys" to the February 20, 2014 email from Thompson to attorney Mulhearn asking whether there was any update to Bahl's efforts to obtain an accommodation from the NBOME, DX LLL, and clearly what the jury was interested in was Bahl's efforts to obtain an accommodation from the NBOME.  In contrast, PX 56 was a letter dated March 28, 2014, from OCR to NYIT, with numerous attachments, including, *inter alia*, witness statements.  *See* Tr. at 851-55.  I concluded that neither PX 56 nor DX JJJ was responsive to the jury's note, and I denied Bahl's request to submit the exhibits to the jury.

This claim provides no basis for relief.

### 3. <u>The Witnesses Purcell and Regnier</u>

Bahl also contends that I committed prejudicial error by not permitting him to call as witnesses John Purcell and Todd Regnier, former medical students of NYIT with disabilities, to testify about NYIT's purported similar treatment of them.  Pl. Mem. at 15-17.  The parties submitted letter briefs on the issue, *see* Docs. 274, 276, and I granted NYIT's request to preclude them from testifying, *see* Tr. at 174-77; *see also* Tr. at 125-30.  Bahl wanted to call Purcell and Regnier to testify to the purported discrimination by NYIT against them. While I acknowledged that in some circumstances, evidence of discrimination against others may be admissible to support a claim of discrimination against a plaintiff, *see* Tr. at 127, 177, I concluded that such evidence should be admitted here.  This was not a class action nor was it a pattern and practice or a hostile environment case; a reasonable accommodation case is different from a race or gender discrimination case; the reasonable accommodation inquiry is a fact-intensive one that is likely to turn on the particular circumstances of a plaintiff's request; and whether others got or did not get an accommodation in their specific circumstances would be of little relevance here.  The facts of Purcell's and

Regnier's situations were very different, and both had resolved their claims. Accordingly, I concluded that the probative value of their testimony was slight and the danger of unfair prejudice and unnecessary delay was high. Accordingly, I barred their testimony pursuant to Rules 403 and 404 of the Federal Rules of Evidence. *See* Tr. at 174-77.

This claim provides no basis for undoing the jury's verdict.

### 4.    Bahl's Failure to Respond to NYIT's Proposal

Next, Bahl argues that I erred by allowing NYIT to suggest that he did not respond to its offer of an accommodation. Pl. Mem. at 22-23. In particular, he contends that the evidence of Thompson's February 20, 2014 email should not have been admitted because it came "after [he] threatened litigation and initiated the first steps in that litigation" by submitting his petition to OCR on January 29, 2014. *Id*. at 23. The claim is meritless. First, Bahl asserted no objection to the February 20, 2014 email. DX LLL; *see* Tr. at 704-06. Second, this lawsuit was not filed until June 27, 2014, and NYIT clearly was still interested in discussing the proposed accommodation even after the petition was filed with OCR. The interactive process did not end merely because Bahl submitted something to OCR. While I had ruled that any offers or proposals made by NYIT

after the filing of the lawsuit were inadmissible, I did not so hold with respect to the filing of the OCR petition.

This claim offers no basis for relief.

**5.** **Bahl's Use of Marijuana**

Finally, Bahl argues that the admission of evidence of Bahl's "recreational use of marijuana" was "highly prejudicial." Pl. Mem. at 23. He also complains about the evidence of his drinking. *Id*. at 24. In my view, as I concluded at trial, this evidence was relevant and not unfairly prejudicial.

First, the evidence of Bahl's marijuana use was relevant to his treatment. As Dr. Adler testified, if marijuana usage is more than intermittent, it could have an impact on the treatment. *See* Tr. at 74-75. Similarly, Dr. Yellin testified (by deposition) that his diagnosis of Bahl could have been influenced by knowledge that Bahl had been smoking pot three times a week. *See id*. at 117. Indeed, Dr. Yellin testified: "It would make me question whether or not he had ADHD as opposed to sequela of smoking a lot of pot." *Id*. He also stated that the knowledge of pot smoking could also have led him to question the other diagnoses he rendered. *Id*. at 118.

Second, the jury could have reasonably concluded that Bahl's marijuana usage and drinking were a factor in his difficulties in medical school generally and in passing the COMLEX 2 in particular. Although there is no evidence that NYIT was aware at the time of Bahl's marijuana usage and drinking, the jury's knowledge of these facts could have influenced -- appropriately -- its evaluation of the reasonableness of NYIT's response, including whether Bahl had a realistic chance of passing the COMLEX 2 without accommodations from NBOME.

Third, the evidence of marijuana use was relevant to Bahl's credibility. He was not, for example, forthright with Dr. Adler as he told him that his marijuana use was "not sustained and not regular," *id*. at 74, when there was evidence to the contrary, *see* DX D, XXXX; Tr. at 402-03, 407, 413-15. He was extremely evasive at trial about his marijuana usage. *See, e.g.*, Tr. at 398-99, 407, 418, 458-59. He testified that his doctors told him that his use of marijuana was not something to be concerned about -- that "it wasn't a problem" -- even though he had ADHD. *Id*. at 400. On the other hand, he acknowledged at his deposition that it was not "advisable" for someone who was being treated for ADHD and other ailments to be smoking pot on a regular basis. *Id*. at 402-03.

Accordingly, the evidence of marijuana usage and drinking was probative, and, in my view, the risk of unfair prejudice was low. This claim provides no basis to set aside the jury's verdict.

## C.    The Court's Conduct

Bahl also seeks to vacate the jury's verdict because "the Court seems to have engaged in conduct that appears partial and/or biased against [him]." Pl. Mem. at 20. I acknowledge that that were times when I was impatient because I was frustrated with Bahl's behavior, but there is little doubt in my mind that he had a full and fair opportunity to prove his claims to the jury. As the Supreme Court has observed, "Judicial remarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily does not support a bias or partiality challenge; they may do so if they reveal an opinion from an extrajudicial source and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgement impossible." *Litkey v. United States*, 510 U.S. 540, 555 (1994).

Bahl refers specifically to a number of comments I made during his cross-examination, but I made those comments because he was unduly delaying the proceedings and I was endeavoring to move things along. For example,

while he had no difficulty for the most part recalling events with precision on direct-examination, on cross-examination he repeatedly invoked the phrase "I can't recall.  It was over ten years ago," or words to that effect.  *See, e.g.*, Tr. at 324, 328, 334, 382, 390, 393, 402, 404, 412, 443, 444, 445, 455, 457, 459, 463, 466, 468, 474, 476, 477.  His evasiveness often required several questions to get to an answer when one question should have sufficed, including, for example, whether he recognized a signature as his.  DX I; Tr. at 461-62.  There were frequent long pauses on cross-examination.  *See id*. at 406, 409-10, 418.  There were times on cross-examination when Bahl would go well beyond a question in an attempt to explain something that might be damaging to him.  *Id*. at 407-10.  It is, of course, fundamental that on cross-examination a witness should simply answer the question and leave it to counsel to ask for an explanation on re-direct if counsel believes an explanation is warranted.

At the start of the afternoon session on the second day of trial, Bahl's counsel asked for an adjournment of the trial then and there as an accommodation so that he could review the transcripts of the trial to that point. Alternatively, Bahl asked that the trial be adjourned upon the completion of his direct examination so that he could study the transcripts to prepare for cross-

examination.  I denied both requested accommodations, as they simply were not reasonable, they would have been unfair to NYIT, and they would have resulted in an unwarranted delay in the proceedings.  *Id*. at 252-54, 257-58.[13]

The bottom line is that Bahl was an extremely difficult litigant who lacked an understanding of how federal lawsuits are to be litigated and trials are to be conducted.  It is no surprise that as soon as the trial was over, his then-lawyers moved to withdraw.  It is no surprise that he has been through *fifteen* different lawyers in this case and the preceding negotiations.

Under the circumstances, I conducted the trial in a way that gave both sides a full and fair opportunity to be heard, while being mindful of the need to move things along expeditiously.  Indeed, far from being biased and partial, I permitted his claims to go to the jury, and I also made a number of rulings in his favor, including, for example, prohibiting NYIT from offering evidence of its efforts to offer an accommodation after the commencement of this lawsuit.  *See* Tr. at 30-31.  I also accepted a number of Bahl's suggestions on the

---

[13]     It is correct, as Bahl notes, that at one point I asked his attorney to ask Bahl "whether he has been recording these proceedings in any way."  Tr. at 259.  I did so because one of the lawyers, during the recess, in an off-the-record conversation outside Bahl's presence, raised a concern that Bahl was recording the proceedings and asked that I inquire.  I did so and accepted Bahl's response that he was not.

jury instructions, including giving a charge on an eggshell or thin skull plaintiff despite my initial reluctance to do so.  Tr. at 591-603, 730-36.

"Expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display, even after being confirmed as federal judges, do not establish bias or partiality." *Litsky*, 510 U.S. at 555-56.  "A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune." *Id.* at 556.

This claim provides no basis for relief.

### D.    <u>Defense Counsel's Summation</u>

Bahl's final point is that defense counsel made "improper and prejudicial" remarks in summation.  Pl. Mem. at 24.  First, Bahl's counsel -- two experienced civil rights lawyers who, frankly, provided Bahl with superb representation -- made no objections during defense counsel's summation.  Second, defense counsel's summation, while spirited, did not cross the line and was certainly "not so inflammatory or so unsupported by the record as to affect the integrity of the trial and entitle [Bahl] to a new trial." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir. 2005).  Indeed, "[r]arely will an attorney's

conduct so infect a trial with 'undue prejudice or passion' as to require reversal."

*Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 271 (2d Cir. 1999). Defense

counsel's comments here did not impugn the integrity of the trial.

On a motion for a new trial, a trial court may view the evidence

through its own eyes, and it is free to weigh the evidence. In my view, the jury

clearly got it right. Bahl proved that he was an individual with a disability

within the meaning of the law, but he did not prove that NYIT failed to provide

him with a reasonable accommodation in violation of either the Rehabilitation

Act or the NYSHRL. Bahl was not a credible witness. In contrast, NYIT's

witnesses were forthright and believable, and it is apparent that NYIT bent over

backwards to do what it could to help Bahl graduate. There was no miscarriage

of justice here, *Bevevino v. Saydjari*, 574 F.2d 676, 688 (2d Cir. 1978), and I will not

disturb the jury's verdict.

## **CONCLUSION**

For the reasons set forth above, Bahl's motion for judgment as a matter of law or for a new trial is denied in all respects.

SO ORDERED.

Dated:     August 15, 2024
           Brooklyn, New York

_____
DENNY CHIN
United States Circuit Judge
Sitting by Designation